Fuld, J. (dissenting).
The sole question presented is whether the firm of Adams & Porter, a New York partnership engaged in the insurance business, “carried on” business ‘1 both within and without the state ’ ’, so as to be entitled to an allocation, pursuant to section 386-g of the. Tax Law, of its net income in computing the unincorporated business tax.
In 1907 Henry Adams and H. L. Porter organized the insurance brokerage firm of Adams & Porter in Houston, Texas. William Young at that time conducted his own insurance business in New York. In 1918 the two firms consolidated under the name of Adams & Porter with offices in both New York and Houston. The partners, other than Porter who died in 1924, were Adams, who moved to New Jersey, Young, a resident of Connecticut and Harry Hilliard, a Texan.
In 1931 Texas enacted a statute which provided, in substance, that all persons “ engaging as partners in the insurance business ” in that state, “ must be residents of Texas ” (Acts 1931, 42nd Leg., ch. 96, p. 150; 14 Tex. Civ. Stat., art. 21.14, § 3). Thereafter, effective January 1, 1932, the terms of the Adams & Porter “ partnership indenture ” were “ modified ” by agreement of the partners: the partnership wa.s dissolved ‘1 so far as it affects * * * [the] office in Houston, Texas so much-of the business of the partnership as belongs ” to that office, including firm name and good will, was sold and transferred to Hilliard of Texas; and, upon his death, all of the assets of the Houston “business,” except Hilliard’s invested capital and accrued earnings, were to “ pass to and belong to the surviving partners in the firm ”. Except “ as [so] modified ”, the agreement provided, the partnership was to 1 ‘ continue to exist in accordance with [the] * * * indenture of partnership ”.
One of the firms ’ most important accounts had been the worldwide cotton merchant, Anderson, Clayton & Company—hereafter referred to as ACCO—with headquarters in Houston. In 1932 Henry Adams and Hilliard succeeded in negotiating an agreement making the Texas partnership, “ Adams & Porter of Houston,” the “ Underwriting Managers ” for all of AGCO’s *610 business in exchange for an undertaking by that firm not to handle other business without AGCO’s consent. The agreement referred to petitioner’s “New York office” and its ‘ ‘ Houston office ’ ’ and its provisions, Hilliard testified, were treated as binding on both firms. The Houston ‘ ‘ office, ’ ’ according to the testimony of the partners, never acted “ independently ” of New York in dealing with AGCO and, “from time-to-time, ” partners and employees of Adams & Porter, New York, worked on the AGCO account in Houston.
Since 1931 and that year’s amendment of the Texas statute, some four new partners have come into the business; two, not resident in Texas, became partners only of Adams & Porter, New York, while the other two, who were residents of Texas, became partners in both the New York and the Texas firms. Both firms, on stationery and forms and in advertisements and listings in professional directories, through the years, described themselves as having “ offices ” in both Houston and New York. Clients of Adams & Porter, in corresponding with it, also seemed to assume that it was a single firm with offices in both cities and, indeed, Adams & Porter carried but one “ Errors and Omissions ” policy with Lloyd’s insuring personnel of its offices in New York, Houston and Brazil.
At any rate, Adams & Porter, New York, received from Houston a share of the moneys realized from the AGCO account and reported it on its New York tax return as nontaxable income from business carried on “ without the state ”. It is this income, plus income received from a Brazilian source — to which we now turn — which the Tax Commission seeks to reach.
In 1946, because of dissatisfaction with the manner in which the Nbav York firm’s “ interests were being represented in Brazil ”, it was decided to open a branch office in that country. Advised, however, that Brazilian law forbade a foreign firm opening a branch, the New York partnership in 1947 organized Adams & Porter & Oompanhia Limitada, the form of organization in Brazil most closely resembling a limited partnership under New York law. From its inception, John Adams, a partner in the New York partnership, acted as the chief executiATe officer or ‘ ‘ Managing Director ’ ’ of the Brazilian firm and remitted its earnings to New York.
The State Tax Commission concluded that, during each of the years involved. 1945 through 1950, the partner shin of Adams & *611 Porter, New York, carried on its business solely within the State of New York for the reason that it did not have an “ office ” or place of business “ without the State ” and that the New York partnership, the Texas firm and the Brazilian Companhia Limitada ‘ ‘ were each separate legal entities ’ ’. Accordingly, it determined that the taxpayer’s entire income was subject to the unincorporated business tax. The Appellate Division confirmed that determination upon the ground that “ it is not unreasonable ” to conclude that the New York partnership had not, “ in actuality,” carried on business in Texas or Brazil. We do not agree; on this record, the conclusion is inescapable that the taxpayer “ carried on ”, in the language of the Tax Law, business 11 both within and without the state ’ ’ (Tax Law, § 386-g).
It is fundamental that ‘ ‘ A statute which levies a tax is to be construed most strongly against the government and in favor of the citizen. The government takes nothing except what is given by the clear import of the words used, and a well-founded doubt as to the meaning of the act defeats the tax.” (People ex rel. Mutual Trust Co. v. Miller, 177 N. Y. 51, 57; Matter of Voorhees v. Bates, 308 N. Y. 184, 188.) Here, quite obviously, there is far more than mere “ doubt ” as to the taxable character of the income in dispute. Originally a Texas firm, Adams & Porter consolidated in 1918 with the Young organization in New York and thereafter, for over a decade, operated as one business with offices in both New York and Houston. When, later, the partnership split up, it was only to the extent required by the Texas statute and when the Brazil firm was created, it was only because Brazilian law prohibited a branch office. Nor can it be denied — indeed, there is not the slightest evidence to the contrary—that the firms all along have maintained a cohesiveness and unity in their operations, both internally and with the outside world, that stamp their relationship one of principal and agent or, at least, mark them as joint venturers, and not, as the Commission contends, firms having only investment ties.
Thus, Hilliard, a partner in both the New York and Houston firms, stated that “ We acted in conjunction with each other. We telephoned each other every day or so. We relayed everything that related to the Anderson, Clayton Company business * * * we consulted with [the New York office] * * * on almost every question in connection with the business ”; “ when *612 important questions arose Houston would not act independently of the views of New York, but would seek agreement of the New York partners.” Indeed, Hilliard stated in so many words that the Texas firm was acting “ as an agent of the New York firm ” and another partner declared, just as decisively, that the receipts from the AGCO business were received by the New York partnership “ through the agency of the Houston firm ”.
Turning to the Brazil firm, there can be even less doubt that it acted in its business dealings as the arm and agent of the New York partnership. From its very inception the South American concern took not only life but direction from New York, there being no contention but that it responded solely and completely to the will of Adams & Porter in New York. Its top decision-making executives at all times were either John Adams, a partner of the New York firm or, in his absence, two or three American resident managers acting under a power of attorney from him. As Adams put it, in his ‘ ‘ management of the company ”, he acted “ not on my own behalf ” but as “ representative of the firm ’ ’; his decisions were ‘ ‘ always ’ ’ made, he said, “in collaboration with [the other] partners ” and were never made “independently of * * * Adams & Porter, New York ”. Although it is true that Adams & Porter “ invested ” in the Brazilian firm, it is also abundantly clear that this was not the type of capital investment that signifies in any way the carrying on of an investment business at the place where the investor maintains its office. Bather, the Brazilian company was simply and specifically organized by the New York firm for the purpose of permitting it, without running afoul of the local law, to carry on business in Brazil and derive an income from such business through the agency of Adams & Porter & Companhia Limitada.
The Tax Commission rests its case on the fact that the firms were ‘ ‘ separate legal entities ’ ’. That, however, is the beginning and not the end of our inquiry. Looking deeper, it is obvious that the existence of separate legal entities to accommodate the provisions of local law can be of no real consequence for purposes of section 386-g of the Tax Law. That statute, as already seen, excludes from taxable income and exempts from taxation the “net income” from “ business * * # carried on * * * without the state ”. As is evident, the law suggests no distinction based on the fact that the income derived from *613 business carried on through an agent or a joint venturer rather than by the taxpayer personally or one of its employees. In other words, it is not whether the firms are separate that is important, but whether the business is “ carried on * * * without the state ”, and the New York partnership was under no legal disability from using an independent entity in another state as its agent. Indeed, courts, both here and in Texas, have held that, for purposes of tax liability, an entity organized in one jurisdiction may carry on business in another through the medium of an agent. (See People ex rel. Badische Fabrik v. Roberts, 152 N. Y. 59, 64-65; Matter of Chapman v. Browne, 268 App. Div. 806, motion for leave to appeal denied 293 N. Y. 933; Ramsey v. Investors Diversified Services, 248 S. W. 2d 263, 267 [Tex. Civ. App.]; see, also, 1954 Atty. Gen. 221, 222-224.)
In addition, since Judge Burke has remarked a number of cases — which we deem irrelevant—dealing with “ a company’s ‘ presence ’ in a State for jurisdictional purposes ” (opinion, p. 606), it is but fitting to note that this court has consistently held that a foreign corporation may do business in New York through an agent, even though the corporation itself is neither licensed nor “ qualified to do business here ”. (Sterling Novelty Corp. v. Frank & Hirsch Distr. Co., 299 N. Y. 208, 210, 211; see, also, Berner v. United Airlines, 3 N Y 2d 1003; Tauza v. Susquehanna Coal Co., 220 N. Y. 259, 270.) It is significant, too, that the Tax Commission does not rely on these “ jurisdictional ” cases, and the reason is apparent. All we are here concerned with is whether Adams & Porter, New York, carried on business “without the state” (Tax Law, § 386-g). Since, on this record, it cannot be controverted that the New York partnership received income through the agency of firms carrying on business in Texas and in Brazil, there is no need to establish that the New York partnership was otherwise “ present ” in those jurisdictions.
What we have said should conclude the appeal and end the case. However, it is asserted that the New York partnership may not be deemed to have carried on business in Texas and Brazil through agents authorized there to do business, because to have done so would have violated the laws of those jurisdictions. Such a charge misapprehends the applicable statutes and disregards the present record.
*614 In the first place, the charge plainly misconceives the purpose of the statutes. The Texas provision is simply to the effect that all licensed agents “ engaging as partners ” in the insurance business in that state must be residents of Texas, while, so far as the record reveals, the law of Brazil merely forbids the opening of a ‘ ‘ branch office ” by a foreign firm. The statute of neither jurisdiction prohibits a foreign partnership from ‘ ‘ doing business ’ ’ through an agent duly licensed and authorized to do business there. The demands of the Texas statute, part of a broad regulatory scheme 1‘ for the protection of both the public and insurance companies ” (Gulf Ins. Co. v. Gaddy, 129 Tex. 481, 486), were met by the formation of a partnership consisting solely of residents of Texas, and the requirements of the law of Brazil, by the creation of the Oompanhia Limitada. By dint of local law, the New York partnership was not in a position to set up its own office in Texas or Brazil and itself act as insurance agent or broker, but that does not mean that it was not privileged to act in those jurisdictions through duly authorized agents and through them carry on business.
In the second place, the imputation of illegality completely overlooks the record. It contains not the slightest evidence to support a determination that the New York partnership was prohibited by local law from doing business in Texas and Brazil through the agency of the firms there located. On the contrary, is to Texas, the evidence is that the 1932 partnership arrangements were made to comply fully with that state’s law and, as to Brazil, the testimony is undisputed that the organization and operation of the Oompanhia Limitada were in entire conformity with the law of that country. Beyond that, the Texas authorities ’—and, undoubtedly, those in Brazil as well—regularly scrutinized the activities of the local firm and raised no objection to its dealings with Adams & Porter, New York. As already noted, the present record indisputably establishes that the New York partnership carried on its business through the medium of properly licensed and authorized local agents. If those transactions violated the laws of Texas or Brazil or offended against their public policy, it is for those jurisdictions to say so; in the absence of such pronouncement, the courts of this state should not take it upon themselves to declare that a principal-agent relationship is interdicted and prohibited by their laws.
*615 Since, then, it was permissible for the New York partnership to do business in Texas, through the agency of Adams & Porter, Houston, and in Brazil, through the medium of the Oompanhia Limitada, there is no element of illegality or any other fact in the record to support or justify the conclusion reached below that the taxpayer had not carried on business without the state. To put it another way, since the record reasonably admits of only one conclusion, that is, that the relationship between the firms is one of agency, the taxpayer, Adams & Porter, New York, is entitled to apportion its net income so as to exclude that portion attributable to the business carried on in Texas and Brazil.
If we decide that the business of the partnership is carried on both within and without the state, then, it seems agreed, the individual nonresident members of the partnership, petitioners in Proceeding No. 2 and Proceeding No. 3, are personally chargeable only with income from the partnership derived from sources within this state. (Regs, of Tax Comm., art. 411; 3 Prentice-Hall, N. Y. Tax Service-, par. 59,661, p. 59,552.)
We would reverse the order appealed from and annul the determination of the Tax Commission.
Chief Judge Conway and Judge Dye concur with Judge Burke ; Judge Froessel concurs for affirmance upon the opinion of the Appellate Division; Judge Fuld dissents in an opinion in which Judges Desmond and Van Voorhis concur.
Order affirmed.